Filed 9/13/16  In re I.O. CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

|  |  |
|---|---|
| In re I.O., a Person Coming Under the Juvenile Court Law. | D070233 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. J.O., Defendant and Appellant. | (Super. Ct. No. NJ15006) |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Phillips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Appellant J.O. (mother) appeals from the juvenile court's order terminating her parental rights as to her son, I.O. (minor), born in March 2014. On appeal, mother contends (1) the juvenile court abused its discretion in denying her Welfare and Institutions Code[1] section 388 petition, and (2) there is no substantial evidence in the record supporting the court's finding that the beneficial parent-child relationship exception did not apply. Affirmed.

FACTUAL AND PROCEDURAL OVERVIEW

In early December 2014, respondent San Diego County Health and Human Services Agency (agency) filed a section 300, subdivision (b)(1) petition on behalf of minor alleging minor had suffered, or there was a substantial risk he would suffer, serious physical harm or illness by the inability of mother and presumed father R.C. (father)[2] (sometimes collectively, parents) to provide minor regular care as a result of "mental illness, developmental disability or substance abuse." Specifically, the petition alleged that on August 23, 2014, "mother was hospitalized as a danger to herself or others after she threatened suicide. Although a safety plan was created for the [minor's] protection, the mother failed to abide by it. Further, both the mother and [father] have a history of

---

1    All further statutory references are to the Welfare and Institutions Code.

2    Father is not a party to this appeal.

substance abuse and domestic violence and both tested positive for amphetamine and marijuana as recently as November 2014 and due to the young age of [minor], and other factors, this [minor] is in need of the protection of the Juvenile Court."

The agency's December 8, 2014 detention report recommended that minor be detained; that visitation with parents be supervised; that parents be offered "voluntary referrals for services"; and that parents be referred for "substance abuse services."  In making these recommendations, the December 8 report noted that mother allegedly threatened suicide in August 2014 because father had broken up with her;[3] that in minor's presence, parents engaged in a verbal argument which turned physical; that during the incident, mother began throwing things, requiring father's nine-year-old sister to take minor out of the room; and that paternal grandmother restrained mother on the floor until police arrived.  While on a 72-hour hold at the hospital, mother tested positive for methamphetamine and marijuana.  Mother admitted she and father had used drugs before the incident.

In its December 8 report, agency noted it received a referral on August 25, 2014 alleging minor, then six months old, was subject to emotional abuse and general neglect by parents.  That same day, an agency social worker interviewed mother at maternal uncle's home.  Mother stated that she and father had been together about a year and that their relationship was " '[r]ocky.' "  Mother then agreed to a written safety plan requiring

---

3    Mother denied threatening suicide and instead claimed it was paternal grandmother who made this accusation after she and father argued while living in paternal grandmother's home.

her to obtain a restraining order against, and to avoid any additional contact with, father. Mother also then agreed not to care for minor alone, based on her positive drug test and on her lack of any "specific plans on how she would remain sober." At the time of her interview, various family members of mother were present including maternal uncle, maternal grandmother, paternal grandmother, maternal great-aunt and cousin.

Within five days, "mother broke the safety plan and violated the restraining order by returning to the father's residence for the weekend." Maternal grandmother attempted to stop mother, but mother left anyways. Paternal grandmother notified agency after mother had shown up in violation of the restraining order. Mother told paternal grandmother that maternal grandmother allegedly had " 'kicked [mother] out and she had nowhere to go.' " In addition, agency on September 5, 2014 received confirmation mother had tested positive for marijuana and "traces" of methamphetamine, "indicating possible use after the incident on 8/23/14."

Also on September 5, mother refused to participate in "voluntary services," stating she did not want agency "involved in her life for a longer period of time." Mother, however, then agreed to place minor in the care of maternal great-aunt, Diana M., who would seek temporary guardianship of minor until "mother and father could safely parent [him]."

The December 8 report included a summary of an October 8 conversation between an agency social worker and Diana M. In that conversation, Diana M. revealed mother wanted to take minor and resume living with father, and "both grandmothers" expressed concern about minor returning to live with parents because of "drug use." The agency

4

social worker told Diana M. that mother needed to follow the plan created by the family. The social worker also separately advised parents that absent their "safety network," agency would consider filing a petition on behalf of minor due to "untreated concerns related to domestic violence and substance abuse."

An agency social worker made an unannounced visit to father's home on October 31, 2014. Mother was present with minor. On questioning, mother stated that minor was still residing with Diana M., but that minor was staying with them for the "Halloween weekend." However, a few days later, Diana M. told the social worker that as soon as agency had closed the previous referral, mother and paternal grandmother came and took minor away and that Diana M. had not cared for minor since. Diana M. also said that after the social worker visited mother on October 31, mother called and asked her to lie and tell the social worker that minor was still living with her.[4]

The December 8 report noted an agency social worker made another unannounced visit to parents' home on November 25. Parents then denied using drugs and agreed to test that same day. Parents failed to test. The following day, parents again were asked to test. This time they both tested positive for methamphetamine and marijuana, with mother also testing positive for amphetamines. Parents also then indicated they had not sought out any counseling or other services, including for substance abuse, after reuniting. Because mother was minor's primary caretaker and because mother was no

---

[4]    Diana M. also spoke with an agency social worker on December 1. Diana M. indicated she had taken care of minor the previous two weekends because parents " 'want[ed] to go out.' "

longer reaching out to, or using her, safety net, the December 8 report recommended minor be detained outside the home.

At the December 8 detention hearing, the court found the petition made a prima facie showing minor was a person described by section 300, subdivision (b)(1). The court ordered minor detained and that parents receive reunification services "as soon as possible" and have "liberal," albeit "separate" supervised visits with minor. The court set the jurisdiction/disposition hearing for January 5, 2015. In addition, the record shows the court advised parents that because minor was under three years old when removed, "parent(s) had six months to participate regularly and make substantive progress in court-ordered treatment programs, to cooperate with or to use department services. If they did not, parental rights could be terminated and a permanent plan of long-term foster care, guardianship, or adoption selected by the Court."

The January 5, 2015 jurisdiction/disposition report included interviews with mother and father. Both admitted recent use of methamphetamine and marijuana. Father admitted to daily methamphetamine use. Mother stated that she would use drugs in the garage when minor was sleeping and that, although she never used in minor's presence, she and father would be " 'high' " when taking care of minor.

The January 5 report noted mother had been arrested, but ostensibly not convicted, for the offenses of being under the influence, burglary and conspiracy to commit a crime. Mother admitted to domestic violence in her relationship with father. Although mother then denied hitting father, the report noted other occasions when mother admitted to striking father, including an instance after he had struck her. Mother denied ever

6

participating in any domestic violence services or treatment. Mother noted she and father were then homeless and living in his car.

Regarding substance abuse, mother admitted to an agency social worker that she began using drugs when she was about 14 years old; that although marijuana was her "drug of choice," she also had used alcohol, mushrooms, acid, cocaine, Vicodin, ecstasy and methamphetamine; and that she had previously participated in an inpatient drug treatment program but left after a month when she learned she was pregnant.

The January 5 agency report noted father also admitted to being in a domestic violence relationship with mother. Father claimed to be both the "victim" and a "perpetrator" in past incidents of domestic violence with mother. He recalled an incident when mother struck him with a " 'stick or curtain hanger,' " and he " 'pushed her' " in response. He also recalled an incident when he " 'backhanded' " mother. Like mother, father never participated in domestic violence treatment. Also like mother, father admitted to substance abuse dating back to when he was a teenager. Father's drug of choice was methamphetamine, which he began using in August 2013, although he also used alcohol, marijuana and mushrooms.

The January 5 report recommended a true finding be made on the petition; that minor be declared a dependent; that parents be offered reunification services consistent with their case plans, which set out the service objectives and client responsibilities for each; and that parents continue to have separate supervised visits with minor, which the report noted up to then, had gone well with "no major concerns."

7

At the January 5 hearing, the court made a true finding on the section 300 petition. The court set the disposition hearing for January 22, 2015. At the January 22 hearing, the court found that minor's placement was necessary and appropriate; that the extent of progress in alleviating or mitigating the causes necessitating placement both by mother and father "has not been substantial"; that agency was to provide services to parents consistent with their case plans "and the parents are ordered to comply with those services"; that parents have liberal supervised visits with minor, which may include visits together if minor's counsel agreed; and that minor be placed in the approved home of a relative (i.e., paternal grandmother). Moreover, the record shows the court at this hearing again advised parents that, because minor was under three years old, they had six months to "participate regularly and make substantive progress in court-ordered treatment programs." The court set a six-month review hearing for July 24, 2015.

The agency's July 24, 2015 status review report recommended termination of reunification services for mother and father. That report noted mother had been arrested in April 2015 for "auto theft, a felony," after mother was pulled over while driving a stolen vehicle; that mother was conditionally released from Las Colinas Women's Detention Facility (Las Colinas) in late June to participate in an inpatient drug treatment program; that mother "promptly violated the conditions of her probation by leaving the

8

treatment center"; and that mother was back in custody at Las Colinas, where it was recommended she should remain until she gave "birth sometime in late September."[5]

Regarding minor, the July 24 report noted he was thriving in the care of paternal grandmother; that minor had paternal aunts and uncles also living in the home that helped to care for, and play with, him; that minor's paternal great-grandmother also provided daycare; and that paternal grandmother was willing to adopt minor should parents' reunification efforts fail.

In recommending termination of reunification services, the July 24 report noted that mother (and father) had "made only minimal progress on their case plan objectives and in their case plan services"; that father had shown up "intoxicated" for at least two visits with minor and had continued to use alcohol; that mother had been incarcerated since early April; that when mother and father had attempted to work their case programs together, as opposed to independently, they had made even less progress in achieving their goals; that each had been "slow" to begin services and had made "minimal" effort in the services provided; that each had been less than "forthcoming"' with agency regarding participation in services, stating they had attended programs but were unable to provide verification of such; that neither mother nor father had participated in any domestic violence services, despite both admitting to being in a domestic violence relationship;

---

5    The July 24 report noted that father was then working full time at a bakery; that he was living temporarily with paternal grandmother; and that he was using alcohol "on occasion." However, according to paternal grandmother, father had "attempted to visit his son with the mother while intoxicated . . . which is in violation of the current visitation order."

that they had made appointments for such services, which they had not kept, and had made excuses deemed "questionable and unacceptable" by agency for missing such appointments; and that during the reporting period and before mother's incarceration, they had engaged in domestic violence "conflicts which required police intervention or intervention by other family members." The report summarized these conflicts, which included an incident when mother burned father's "identification card" and police were summoned and another instance when a relative of minor stated that father had been afraid after father reported mother had a knife.

The July 24 report further noted that, from January 27 until her arrest in early April, mother participated in only three parent education classes and that she had two cancellations and one no-show in connection with these classes. In addition, mother failed to participate in substance abuse treatment during the six-month reporting period, which included her failure in January and February to make several intake appointments at a recovery center. The report noted mother avoided contact with agency during this time period and was found to be in possession of drug paraphernalia—a hypodermic needle—when she was arrested in April for vehicle theft.

The report included a summary of a visit between mother and minor that took place on April 30, 2015 at Las Colinas. According to an agency social worker, the visit went well until minor had a bowel movement. Mother then began to call minor " 'Stinky' " and refused to change his diaper, saying it might make her "throw[ ]up." Mother then relayed that father used to change minor's diapers. The agency social

10

worker reported mother talked about her future with father during the visit, which led the social worker to remind mother to focus on minor during the visit.

The July 24 report described mother's visits with minor to be "inconsistent, short-lived and poor in quality." In addition, the visitation supervisors reported that, during visits, mother appeared more interested in finding out about father rather than focusing on minor; that mother expected others to "feed and hold" minor, and to change his diaper and clean up after him; that on "more than one occasion the mother has told the care provider that she didn't want to be [minor's] mom anymore and wanted to give her parental rights away"; and that mother threatened to go to Mexico on release.

At the August 31, 2015 six-month review hearing—which had been continued from July 24—the court found that parents had not made substantive progress with the provisions of their care plans. In making this finding, the court noted mother had been enrolled in an inpatient drug treatment program since August 5. The court nonetheless found that returning minor to parents would be detrimental, as parents, while in the early stage of addressing their substance abuse, had failed to engage in any domestic violence services; that parents' failure to engage in domestic violence services was of substantial concern because their issues were not just substance abuse or domestic violence but both, and, in the court's view, success required parents to address both issues; and that there was not a substantial probability minor would be reunited with parents in the next six months. As such, the court terminated reunification services and set a section 366.26 selection and implementation hearing for December 29, 2015.

11

Agency in connection with the section 366.26 hearing filed a December 29, 2015 "WIC report" and later, after that hearing was continued to February 17, 2016, a February 8, 2016 addendum report. In each report, agency continued to recommend termination of parental rights and adoption as minor's permanent plan.

The December 29 report noted that mother gave birth on September 9, 2015 to a baby boy, J.; that mother and J. had been residing in the drug treatment center that mother entered on August 5; and that mother was currently engaged in voluntary services with agency for J. Mother further reported she expected to be released from her inpatient treatment program shortly.

The December 29 report described five visits between mother and minor between late October and early December 2015. In each visit, minor showed no signs of distress when leaving mother. It was noted that minor called mother " 'mom' " during these visits, which visits, an agency social worker reported, went "well"; but that minor also referred to paternal grandmother as his " 'mom.' " During the visits, mother changed minor's diaper. At the conclusion of a visit on December 2, mother told an agency social worker that, while on a "pass" from the drug treatment center, she visited father and "could tell he has been using drugs and that she saw drugs in his car."

An agency social worker spoke with minor's caregiver/paternal grandmother on December 14 regarding weekend visits between minor and parents. Although paternal grandmother stated the visits between father and minor went well, paternal grandmother stated she suspected father was still using drugs as he "appears to be getting thinner and [she] has noticed a change in his face." However, paternal grandmother stated she knew

12

for a fact that father was continuing to consume alcohol. With respect to the visits when both mother and father were present, paternal grandmother noted mother "pays more attention to the father at visits than to [minor]."

The December 29 report noted there were 47 families in San Diego County approved to adopt a child matching minor's characteristics; that minor also was specifically adoptable as his current relative caregiver—paternal grandmother—wanted to adopt him if parental rights were terminated; that paternal grandmother had passed the criminal background clearance of agency; that paternal grandmother had been a "supportive stable influence in [minor's] life"; that minor sought out paternal grandmother to have his needs met and was affectionate toward her; that minor was thriving under paternal grandmother's care; and that paternal grandmother had been in minor's life since he was born and had been taking care of him since January 2015, or for the last 11 months.

Agency in its December 29 report concluded it would not be detrimental to minor if mother's (and father's) parental rights were terminated. Although agency noted minor seemed to enjoy the visits with his brother J., it further noted minor and J. had never lived together and, thus, had not shared experiences outside of their supervised visits. In addition, agency determined the relationship between mother and minor did not rise to the level of a parent-child relationship, as minor also referred to paternal grandmother as his "mom," minor "separate[d] easily" from mother after their visits and minor looked to paternal grandmother as his parent. If freed for adoption, agency concluded minor would enjoy the care and stability provided by paternal grandmother.

13

On February 2, mother filed a section 388 petition, asking the court to vacate its August 31, 2015 order terminating reunification services and instead to order (i) mother receive further services until June 2016, the 18-month review date and (ii) unsupervised visits with minor. Alternatively, mother sought placement of minor with her. In support of her petition, mother stated her circumstances had changed because she had successfully completed a four-month inpatient drug treatment program and had logged 250 vocation hours as a daycare support person in connection with that program. Mother also stated she was compliant with a voluntary care plan for J., who was in her care.

Mother alleged in her section 388 petition that it was in minor's best interest to grant her relief because she and minor have a "positive relationship"; that since she began inpatient treatment, her visits with minor have been "consistent"; that minor referred to her during such visits as "mom"; and that minor had a "relationship" with J. Attached to the petition were two letters each dated December 11, 2015. One letter confirmed mother had completed 250 vocation hours as a daycare support staff, in which mother was described as reliable, responsible and hardworking, among other admirable traits. The other letter also confirmed mother had successfully completed inpatient drug treatment and had negative drug tests while in the program.

Agency opposed the section 388 petition. In its February 8, 2016 addendum, agency commended mother on her efforts but remained concerned because mother and father were back together and were "fight[ing] often." In addition, mother had not provided any evidence showing she had not used drugs since leaving the drug treatment program in December.

14

Specifically, the February 8 addendum reported that minor's caregiver/paternal grandmother called an agency social worker on February 2, 2016 "to relate an incident the night before [involving mother and father]. The caregiver stated that the mother and the father had been fighting and that the father had been drinking and was intoxicated at a local store. The caregiver stated that the mother dropped the father off at the caregiver's home as the mother thought the father would calm down at the caregiver's home. At the caregiver's home the father took a beer from the refrigerator. The caregiver, upon realizing that the father was intoxicated when he arrived, asked the father to leave the home. The caregiver stated that the father became upset and threw the beer bottle breaking it on the back yard [*sic*] fence. The caregiver then locked the father out of the house and the father left. The caregiver stated that a few minutes later the mother returned and asked the caregiver to watch the mother's other child while the mother went to buy diapers. The caregiver agreed. The father then returned to the home a few minutes after the mother left, was yelling and demanding to be let in. When the caregiver refused, the father began throwing chairs outside and then threw bricks at a boat stored on the property. The caregiver called the police and the father was arrested. The caregiver stated that during the incident, she instructed her older children to go to their bedrooms with the younger children in order that they would be away from the front of the house where the father was yelling and engaging in property destruction."

In addition, the February 8 report noted that recent visits between mother and minor, which took place at paternal grandmother's home, had been "poor." Specifically, paternal grandmother reported during such visits the mother and father "regularly s[a]t on

15

the couch and watch[ed] a movie while [minor] play[ed] and d[id] not interact much with him."  Because mother and father continued to be involved in what an agency social worker described as a "chaotic and unhealthy relationship" that put minor at substantial risk, as demonstrated by the incident on February 1, and because domestic violence was one of the reasons minor was initially removed, agency recommended that mother's section 388 petition be denied, that parental rights be terminated and that a permanent plan of adoption be ordered for minor.

On February 17, the court held a hearing on mother's section 388 petition.  Mother testified that she signed a "voluntary contract" with respect to J. about a month earlier; that J. was then about five months old and that father was also J.'s father; that she nonetheless had been in contact with agency since J. was born; that she had completed the inpatient drug treatment program, had attended 12-step meetings and was then attempting to get services for domestic violence; and that she drug tested once a month and, at the time of the hearing, all of her tests had been negative.

Mother denied there were any recent domestic violence incidents with father.  In connection with the February 1 incident described in the agency addendum report, mother stated father was merely "acting up" after he "started drinking."  As a result, mother testified she dropped father off at paternal grandmother's home because it was the "closest location" she could think of at the time.  When asked if father drank often, mother testified: "No.  I mean, occasionally."  Mother stated she told father he was not allowed to be using drugs, including "coming down" or drinking alcohol, around her and J.

16

Mother testified minor was affectionate with J. during visits, including giving J. "kisses." Minor also referred to J. as " 'my baby.' " Mother further testified when minor sees her, he says, " 'Mom. Mom here.' " Mother stated she would be willing to cease all contact with father if necessary to get minor back.

The record shows the court next asked mother a series of questions about the February 1 incident. Mother admitted father had been drinking that day before she and J. picked him up, as he was—in her words—"already buzzing"; that he bought "more beer" at a gas station when they were filling up the car with gas; that, as mother was driving, father attempted to open a bottle of beer in the car; that mother in response began "yelling" and "arguing" with father, telling him he could not drink because she was on "probation"; and that when they approached paternal grandmother's house, where minor lived and was then present, father got mad and started throwing the beer out the car window. Mother described father's behavior as him throwing a "temper tantrum." Mother next called paternal grandmother from across the street.

Mother testified that she took father to paternal grandmother's home because it was closer than "*our home*" (italics added). On questioning, mother admitted father "recently" had begun living with her and J. When asked how recently, mother said beginning on February 1, or perhaps a few days before that. Mother noted father had recently lost his job. With regard to alcohol, mother stated father tended to "cr[y] more" when he drank and tended to get "more and more angry." Mother further noted the day following the February 1 incident, minor reported, " 'Dad's bad boy. Dad beer bottle,' "

17

then pointed and said, " 'Dad throw.' "  Mother stated this was *not* the first time minor had reported instances of such behavior by father during their visits.

After hearing mother's testimony and the argument of counsel, and considering the various reports, the court denied mother's section 388 petition.  In so doing, the court stated it initially was inclined to grant mother partial relief.  But the court found it was a "very serious development" when it learned mother and father were back to living together, particularly in light of the February 1 incident.  The court noted:

"She [i.e., mother] has a newborn that would be at risk -- or son, I'm sorry.  That son would be put at risk if this is repeated.  There was potential for [minor] to be injured.  [Minor] has told the mother on occasions prior to February 1st about the father's conduct.  I don't know why there has to be external conditions [i.e., perhaps an order requiring mother to avoid father] when I think a person who is trying to be protective would draw the conclusion that there needs to be demonstrative improvement on the part of the other parent.

"Certainly after the February 1st incident where he totally disregarded the mother's appropriate admonitions about drinking where she very appropriately pointed out the consequence not only to him, but to her.  And to not take further action to solidify protection of her newborn son is extremely serious.  And in my view, despite the laudable progress the mother has made, this is a complete reversion back to the behavior that gave rise to the original true finding [involving minor].

"This doesn't involve the mother imbibing alcohol.  But it does involve the mother's recognition that father does imbibe alcohol.  He has alterations in his behavior

18

and his attitude. The mother's treatment, certainly given her progress, would indicate to the mother that there's an enabling aspect in not putting forth her own conditions and enforcing those. I do think that the mother has not established that there's been a substantial change in circumstance because of the analysis the court just gave. [¶] . . .[¶]

"But I'll reiterate, . . . I see no validation of the mother's position that she needs external conditions rather than going through all of the risk assessments each parent must make within the context of substance abuse and domestic violence and imposing not just conditions on her own, but enforceable conditions, in which there is demonstrably an effort to implement that. And by cohabiting with the father at or about the time of the February 1st incident, indicates that that is simply not a part of the mother's thought process, for whatever reason. And I think that's so sad and tragic.

"But I cannot find that mother has carried her burden by a preponderance of the evidence on the issue of return, or the issue of going to the 18-month mark, or on the issue of unsupervised visits. [¶] With respect to going to the 18-month mark, I reconsidered that. But I do not believe over the course of the next four months it would be enough time for mother to gain enough insight, enough understanding, and enough strength to understand the significance of her current relationship with the father given the February 1st incident. I've listened to mother's testimony very carefully. And never once did she articulate in any great detail how significant the impact could be on J[.] when her older son [minor] has told her that it has impacted him.

"With respect to unsupervised visits, again, the mother's cohabiting with the father. It's shown that she cannot, on her own, have him be responsive to her appropriate

19

admonitions and not drink. And unless and until that can be established, [minor] would be at risk. So I'm unable to find there's been a change to support that.

"With respect to [minor's] best interests, I think the record is clear that he's been impacted by whatever he's observed, and that it would not be in his best interest at this point in time to put him through either the reunification process or return to the mother without there being substantive improvement. So I cannot conclude it would be in the best interests of [minor] to grant any of the three requests for relief [in the petition].

"So the court will deny the mother's motion. . . . I was fully prepared to grant at least partial relief to mother until it became very clear that over the last 16 days or more, the mother has not taken steps to protect herself or . . . either child."

After a recess, the court next turned to the section 366.26 selection and implementation hearing. By stipulation, the court found evidence from the section 388 hearing would also be considered in the section 366.26 proceeding. After hearing argument of counsel and reviewing the reports and evidence including from the section 388 hearing, the court, "acting in minor's best interests," found that minor was likely to be adopted; that minor had been in the care of paternal grandmother for a "substantial portion" of his life and that paternal grandmother wished to adopt him; that by his conduct and age-appropriate comments, minor showed he felt safe and secure in paternal grandmother's care; and that even if paternal grandmother was unable to finalize the adoption of minor, there were 47 other approved available prospective adoptive homes that would be willing to adopt a child with minor's characteristics.

20

The court also found that termination of parental rights of mother and father would not be detrimental to minor; that, although mother and father had "regular and consistent visits" with minor that were described as generally appropriate and enjoyable, it nonetheless would "not be in [minor's] best interest to promote or facilitate either a mother[-]child or a father-child relationship" and "further[,] . . . that whatever benefit may have been conferred upon [minor] by the contact he has had with each and both of his parents," that relationship was "greatly outweighed by his need for stability and placement which can only be achieved through adoptive placement."

With respect to J., the court found "there would not be a substantial interference with [minor's] relationship with J[.] In considering [minor's] long-term emotional interests, ongoing contact would not be in [minor's] best interests as compared to the benefit of legal permanency adoption. [¶] In arriving at that conclusion, the Court is aware that the record reflects that [minor] and J[.] have not been raised as siblings in the same home. There are shared common experiences to the extent that J[.] is brought to the visits that the mother has with [minor]. And [minor] and J[.] take part in the extended family activities. However, there is no evidence that there is an existing close and strong bond existing between [minor] and J[.]" As such, the court terminated the parental rights of mother and father, "finding that adoption [was] in [minor's] best interests."

21

DISCUSSION

I

Section 388 Petition

A. *Guiding principles*

Section 388 permits any person having an interest in the child to petition for a hearing to change, modify, or set aside any court order previously made on grounds of change of circumstance or new evidence. (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) To prevail, the petitioner must demonstrate by a preponderance of the evidence that new or changed circumstances warrant a change in the prior order and that changing the order will serve the child's best interests. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959; *In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.)

After an evidentiary hearing, such as what occurred in the instant case, we review the denial of a petition under section 388 for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)

As noted, the petition to modify a prior order must include (1) a showing of changed circumstances, and (2) the requested modification must be in the child's best interests. The burden is on the petitioning party to show *both* elements. (*In re Casey D.*

22

(1999) 70 Cal.App.4th 38, 47.) In determining whether a section 388 petition makes the necessary showing, the court should consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188–189.)

Moreover, the best interests of the child are of paramount consideration when a modification petition is brought—as it was here—*after* termination of reunification services. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) In assessing the best interests of the child at this juncture, as the court here correctly noted, we look not to the *parent's* interests in reunification but to the needs of the *child* for permanence and stability. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

Thus, a "petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) "[W]hen a child has been placed in foster care because of parental neglect or incapacity, after an extended period of foster care, it is within the court's discretion to decide that a child's interest in stability has come to outweigh the natural parent's interest in the care, custody and companionship of the child." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419.)

Indeed, the " 'escape mechanism' " (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528) provided by section 388 after reunification efforts have ceased is only available when a parent has "*complete[d] a reformation*" (*ibid.*, italics added) before parental rights have been terminated. This is because, if a parent's circumstances have not changed

23

sufficiently to permit placement of the child with that parent, reopening reunification "does not promote stability for the child or the child's best interests" when the child is otherwise adoptable.  (*In re Casey D., supra,* 70 Cal.App.4th at p. 47.)

B.  *Analysis*

Here, there is ample evidence in the record to show the court properly exercised its discretion when it found mother's circumstances were changing, but had not yet changed, and when it found the proposed modification sought by mother—ordering additional reunification services and allowing unsupervised visits or, in the alternative, placing minor with her—was not in minor's best interests.

Indeed, the record shows that, at the time of her petition, mother and father were once again living together despite the fact that (i) they both freely admitted there was domestic violence in their relationship; (ii) the record included instances of such domestic violence, including the argument that turned physical in late August 2014 that initially led to agency involvement with the family and father's admissions he had "backhanded" mother and mother had come after him with a " 'stick or curtain hanger' "; (iii) neither mother nor father had *ever* engaged in any domestic violence services at the time of mother's section 388 petition, including during the reunification period when such services were repeatedly offered to them; and (iv) as recently as February 1, 2016, or just about two *weeks* before the combined sections 388/366.26 hearing, mother and father had argued in front of J. because father was intoxicated and had attempted to open a bottle of beer in a car being driven by mother, who promptly dropped father off at paternal grandmother's home where minor and other children were living.  Such evidence amply

24

supports the juvenile court's finding mother's circumstances were changing, but not yet

changed, as it related to father and what agency noted was their "chaotic and unhealthy

relationship."

But there's more. The record also shows that, with respect to the February 1

incident, mother downplayed father's behavior, merely referring to him as throwing a

"temper tantrum." On questioning, mother denied the February 1 incident involved

domestic violence, an argument she repeats on appeal, despite the fact she admitted to

yelling and screaming at father while J. was in the car, and despite the fact father was

throwing beer bottles out the car window as they approached/arrived at paternal

grandmother's home.

In addition, mother also appeared to downplay the fact father was *intoxicated*

during the February 1 incident, as she indicated she took father to paternal grandmother's

home to "calm down" because he was "acting up" after he "started drinking." Mother

noted when she picked up father that day he was "already buzzing." However, the record

suggests it was only after father bought beer at a gas station and attempted to open a beer

bottle while she was driving that mother admonished father about his intoxication. The

record also includes mother's *admission* to an agency social worker during a December 2

visit with minor that while mother was on a pass from her treatment program, she visited

father and she "could tell he has been using drugs *and that she saw drugs in his car*."

(Italics added.) Given mother had just completed a drug treatment program, the fact she

would continue to live with father even though he continued to use drugs, including

alcohol, further supports the finding of the juvenile court that mother's circumstances were changing, but not changed, for purposes of her section 388 petition.

Finally, it does not appear mother was dissuaded from continuing to live with father even after it was clear the February 1 incident impacted minor. The record shows that minor, in connection with this incident, said to mother, " 'Dad's bad boy. Dad beer bottle' " and then made a throwing gesture and said, " 'Dad throw.' " Mother also testified this was *not* the first time minor had referenced father's bad behavior.

While this court, like the juvenile court, commends mother on the steps she has taken to achieve sobriety, the record shows the juvenile court's finding mother's circumstances were changing, but not yet changed, was based on ample evidence and was neither arbitrary nor capricious nor patently absurd. (See *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

Moreover, even *if* we conclude the court abused its discretion when it found mother's circumstances were changing and not changed for purposes of section 388, we nonetheless would affirm the court's denial of her petition because we also conclude mother failed to show that the relief requested in her petition would be in minor's best interest. (See *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317 [noting the best interests of a child are of paramount consideration when a modification petition is brought *after* termination of reunification services].)

In addition to the evidence summarized *ante*, the record shows that, at the time of the combined sections 388/366.26 hearing, minor had spent about 11 months, or more than half his young life, in out-of-home care; that there was a strong bond between minor

26

and paternal grandmother; that minor looked to paternal grandmother as his parent; that paternal grandmother met all of minor's needs and expressed an interest in adopting minor in order to provide him with stability, consistency, safety and a permanent home; and that minor was thriving in her care.

In contrast, the record shows that mother had not taken care of minor since December 2014, when he was removed from her care; that, even before December 2014, minor had been placed in a temporary guardianship with Diana M., maternal great-aunt, where minor had lived until agency closed the referral; that after minor's removal, mother was offered reunification services for six months but failed to make any meaningful progress in such services and instead was incarcerated for vehicle theft and possession of drug paraphernalia (a syringe); that during visits while mother was incarcerated at Las Colinas, mother did not change minor's soiled diaper and instead expected others to care for minor, including feed and hold him; that, although minor referred to mother as "mom" during five visits beginning in late October and ending in early December 2015, minor showed no emotional distress when his visits with mother ended; and that minor also referred to paternal grandmother as "mom" and looked to paternal grandmother for all his needs.

Based on this evidence, which is substantial, we further conclude the court properly exercised its discretion when it found mother failed to satisfy her burden to show it was not in minor's best interests to continue living with paternal grandmother, who occupied the role of parent, provided him consistency and permanency and met his *daily* needs, and it was in his best interest for mother to receive additional services and

27

unsupervised visits (while still living with father), on the one hand, or to be placed with mother (again, while still living with father), on the other hand. (See *In re Stephanie M., supra*, 7 Cal.4th at p. 317; *In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

## II

### Section 366.26 and the Beneficial Parent-Child Relationship Exception

Mother contends there is insufficient evidence to support the court's finding that she did not meet her burden of showing a beneficial relationship with minor for purposes of the beneficial parent-child relationship exception to adoption. (See § 366.26, subd. (c)(1)(B)(i).)

As noted, when reunification services are terminated, such as in the instant case, the focus of a dependency proceeding shifts from preserving the family to promoting the best interest of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the section 366.26 hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan, (2) appoint a legal guardian for the dependent child, or (3) order the child placed in long-term foster care. (*Ibid.*)

However, "[a]doption . . . is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) Thus, "[i]f the child is adoptable, there is a strong preference for adoption over alternative permanency plans." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588.) All that is required to show a dependent child is adoptable is "clear and convincing evidence of the likelihood that adoption will be

28

realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406; see § 366.26, subd. (c)(1).)

Here, the court at the section 366.26 hearing found (by clear and convincing) evidence that minor was likely to be adopted, which finding mother does not challenge on appeal. In any event, the record contains ample evidence supporting the finding that minor was both "specifically and generally adoptable," inasmuch as minor's current relative caregiver, paternal grandmother, wanted to adopt him, and there were 47 possible families in San Diego County with approved home studies that also were willing to adopt a child with minor's characteristics.

Once the court found that minor was likely to be adopted within a reasonable time, it was required to terminate parental rights and select adoption as the permanent plan unless mother (or father) showed that termination of parental rights would be detrimental to minor, including, as she contends here, under the beneficial parent-child relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i). (See *In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if the court finds a "compelling reason" for determining that termination of parental rights would be "detrimental" to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The statutory phrase "benefit from continuing the relationship" has been interpreted to mean that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a

29

permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

In determining whether the child would benefit from continuing the parent-child relationship for purposes of this exception, the court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of establishing the applicability of the beneficial parent-child relationship exception, a parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Rather, the "parent must show he or she occupies a parental role in the child's life." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; accord, *In re Derek W.*, *supra*, at p. 827.)

Thus, a "biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship

30

that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466, italics omitted; accord, *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

On review of the sufficiency of the evidence to support a court's order terminating parental rights and freeing the parent's child for adoption, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "We must affirm the juvenile court's rejection of any exception to termination of parental rights if the court's findings are supported by substantial evidence." (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)[6]

"The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

---

[6]     Agency (once again) urges us to adopt a hybrid standard of review, applying both the substantial evidence and abuse of discretion standards, as some courts have done. (See, e.g., *In re J.C.* (2014) 226 Cal.App.4th 503; *In re Bailey J.* (2010) 189 Cal.App.4th 1308.)  However, as we (repeatedly) have noted, there is little practical difference between the two standards.  (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [recognizing the "practical differences between the two standards of review are not significant"].)  In any event, we need not decide whether to apply the hybrid standard here because we note that the result would be the same regardless of whether we apply a hybrid or substantial evidence standard in this case.

In the instant case, we conclude mother has failed to show there was no substantial evidence in the record supporting the finding that the beneficial parent-child exception did not apply in this case. Indeed, beginning in early September 2014, when minor was then about six months old, mother agreed to allow maternal great-aunt Diana M. care for minor after mother failed to adhere to the written safety plan that required her to avoid any additional contact with father following their August 23, 2014 domestic violence incident. While mother at one point took minor back sometime in or about October 2014 after agency closed the referral, and then lied to an agency social worker about doing so and encouraged Diana M.—who was seeking temporary guardianship of minor—to lie as well, minor was once and for all removed from mother's care in early December 2014.

Thus, since December 2014, mother has not cared for minor or otherwise occupied a "parental role" in minor's life. (See *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108–1109.) In visits with minor when mother was incarcerated at Las Colinas in mid-2015, mother refused to change minor's diaper and expected others to hold and feed minor. While the record shows minor enjoyed his five visits with mother between late October and early December 2015 when mother was participating in an inpatient drug treatment program (see *In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827 [evidence of a beneficial parent-child relationship requires more than pleasant visits]), the record also shows the visits between mother and minor were less satisfactory after mother completed the program, when she *and* father visited minor together.

Indeed, according to paternal grandmother, mother seemed more interested in father during "family" visits with minor, and she and father often spent more time

32

together than with minor during such visits. The record also shows when minor's visits with mother ended, he was in no distress when he left mother.

Moreover, the record shows that mother had completed a four-month inpatient drug treatment program in December 2015. While commendable, the record shows only about *two months* had passed between completion of that program and the combined sections 388/366.26 hearing. In light of the evidence that mother had begun using drugs when she was about 14 years old, had used myriad different drugs, including mushrooms, acid, cocaine, Vicodin, methamphetamine and marijuana (the latter, her "drug of choice"), and had struggled to remain sober for a substantial period of time, including throughout the reunification period, the record supports the finding mother was then in the early stages of recovery. This finding is further supported by the evidence, discussed *ante*, that mother had yet to receive any services for domestic violence, which services, the juvenile court noted, were essential given the *continuing nature* of the relationship between mother and father, as aptly demonstrated by the February 1 incident.

In contrast, the record shows at the time of the section 366.26 hearing minor had lived with, and had been under the care of, paternal grandmother since January 2015, or more than a year of his young life (i.e., he was born in March 2014); that paternal grandmother had been in minor's life since his birth; that minor looked to paternal grandmother as a parental figure; that paternal grandmother took care of minor's daily needs; that minor and paternal grandmother had developed a strong bond, which included minor referring to her as " 'mom' "; and that minor was thriving in his placement with paternal grandmother, who also wanted to adopt minor.

33

Thus, when balancing the "strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer" (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) in light of the circumstances, we conclude the record amply supports the court's finding that the beneficial parent-child exception did not apply in this case. (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424 [noting the parental relationship must be more than " 'frequent and loving contact' " for the exception to adoption to apply].)

## DISPOSITION

The order denying mother's section 388 petition and terminating her parental rights is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

34